# IN THE COURT OF APPEALS OF IOWA

No. 22-1960
Filed March 29, 2023

**IN THE INTEREST OF P.C.P. and R.C.K.,**
**Minor Children,**

**B.C., Mother,**
    Appellant,

**A.K., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Jefferson County, William Owens,

Associate Juvenile Judge.


A mother and father appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**


Patricia J. Lipski, Washington, for appellant mother.

Larry J. Brock of Brock Law Office, Washington, for appellant father.

Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

Robert Breckenridge, Ottumwa, attorney and guardian ad litem for minor

children.


Considered by Tabor, P.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

B.C. is the mother of two young boys, P.C.P. and R.C.K., ages six years and five years at the time of the termination hearing.  A.K. is the father to R.C.K.  Both B.C. and A.K. appeal the termination of their parental rights.[1]  The mother contends the State failed to prove a ground for termination, the Department of Health and Human Services (DHHS) failed to provide reasonable efforts, and termination is unnecessary because a guardianship could be established.  The father asks for a six-month extension for reunification efforts.  We find the State established a ground for termination by clear and convincing evidence, DHHS made reasonable efforts, and on this record, a guardianship is not appropriate.  We decline the father's request for a six-month extension.  Accordingly, we affirm.

**I.      Background Facts & Proceedings**

This family came to DHHS's attention in the summer of 2020 because of multiple allegations of the mother's failure to supervise the children, including incidents where the children were observed playing in an open second-story window and wandering around unattended in a parking lot.  Each time, the mother appeared to have been asleep while the children engaged in dangerous activities.  The mother's home was also unsanitary.[2]  As a result, the children were removed from the mother's custody on July 22, 2020, and placed in the custody of A.K.  Both children were adjudicated in-need-of-assistance (CINA) on August 19.

---

[1] P.C.P.'s father's parental rights were also terminated.  He does not appeal.
[2] The home had food matter and trash scattered throughout, with hundreds of flies present.  Maggots, both alive and dead, were present, with the children's toys and beds intermingled.  One of the toddler beds was full of trash, including used diapers and pull ups.

A.K. and the children resided with his wife, his wife's mother—A.K.'s mother-in-law—and A.K.'s other child.[3] P.C.P. and R.C.K. were removed from A.K.'s custody and placed in the custody of his mother-in-law in April 2021 due to A.K. repeatedly testing positive for methamphetamine. However, the children continued to reside in the same home as A.K. This arrangement lasted until June 2022, when A.K.'s mother-in-law asked for the children to be placed in foster care. Custody of both children was placed with DHHS. The children have remained in the same foster care placement since June.

The mother struggled with her mental health throughout the case. She began therapy with three separate providers but ceased attending each time. She reportedly has acknowledged that therapy would be beneficial, but refuses to attend as long as DHHS is requiring her to participate. She does not consistently engage with her medication management provider.

The mother has also failed to keep her home in a sanitary and safe condition. The family service provider testified that the mother is only able to maintain her home's cleanliness while providers assist her—she cannot do so on her own. Despite arranging for providers to observe her home in August, the mother refused their entry. Consequently, visits—one hour a week fully supervised during which the mother is frequently not engaged with the children—occur in a park because providers cannot verify the safety of the mother's home. The mother also reported to a treatment court that she was facing eviction in September because of the uninhabitable conditions of her apartment.

---

[3] This child is not a subject of this appeal.

Concerns about the mother's substance abuse also arose. The mother tested positive for methamphetamine in March 2021, around the same time A.K. tested positive for the same drug. She has never followed through with treatment. She tested positive for methamphetamine in June 2022 and on August 31, 2022, the last test just shortly before the termination hearing.

A.K. also struggles to maintain his sobriety. He tested positive for methamphetamine at the end of August 2022. He has not consistently engaged in mental-health or substance-abuse treatment. He is unemployed and does not have stable housing—he appears to switch between living with the mother and with his wife. His participation in visits since the children's move to the foster care placement has been rare.

P.C.P. and R.C.K. appear to do well in their foster care placement. A family service provider testified that the children are currently doing "the best they've ever done." While they are generally happy to see their mother, they ask providers why they cannot live with the foster placement permanently.

The State filed petitions to terminate the parents' parental rights on August 15, 2022. The hearing was held October 5. The juvenile court terminated B.C.'s parental rights pursuant Iowa Code section 232.116(1)(f) (2022) and A.K.'s rights pursuant to section 232.116(1)(f) and (g). Both parents appeal.

## II.     Standard of Review

We review the termination of parental rights de novo. *In re P.L.,* 778 N.W.2d 33, 40 (Iowa 2010). We follow a three-step analysis. We first examine if the State established a ground for termination under Iowa Code section 232.116. *Id.* at 39. We then determine if termination is in the children's best interests. *Id.*; *see also*

Iowa Code § 232.116(2). Finally, we must decide whether to apply an exception found in section 232.116(3). *P.L.*, 778 N.W.2d at 39. As ever, "the first and governing consideration . . . is the best interests of the child[ren]." Iowa R. App. P. 6.904(3)(n).

**III.    Mother**

B.C. raises three issues on appeal. She claims the State did not establish a ground for termination. She also claims DHHS did not make reasonable efforts to reunite the family. And she contends the juvenile court should have imposed a guardianship for both children with A.K.'s mother-in-law.

**A.    Ground for Termination**

B.C. claims the State failed to establish a ground for termination—Iowa Code section 232.116(f)—by clear and convincing evidence.[4] She only contests the last element—whether the children can be returned at the present time. "At the present time" means at the time of the termination hearing. *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

We conclude the children cannot be returned to B.C. at the present time. The mother has not made progress addressing her mental health. Providers have

---

[4] That section provides for termination of parental rights when the court finds:
    (1) The child is four years of age or older.
    (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
    (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
    (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

been unable to verify the condition of her home as the mother refuses to allow them entry. And some reports suggest the mother is facing eviction due to the uninhabitable state of the home. She tested positive for methamphetamine shortly before the termination hearing and has not meaningfully engaged in substance-abuse treatment. The concerns that lead to the children being removed remain unresolved. And additional concerns have surfaced since the removal due to the mother's drug use.

## B.    Reasonable Efforts

The mother claims DHHS failed to make reasonable efforts to reunify the family. In particular, she highlights that the provider who conducted a psychological evaluation in February 2022 failed to provide a written report. She claims she objected to the use of that particular provider at the January 2022 permanency hearing, making any failure to obtain the report the fault of DHHS.

"The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (en banc). "The concept covers both the efforts to prevent and eliminate the need for removal." *Id.*

On the record before us, it is unclear when, if at all, the mother objected to the use of DHHS's preferred provider prior to the termination hearing. The permanency order reflects that none of the parents requested additional services, and the hearing does not appear to have been reported. And the mother did not file a motion for reasonable efforts prior to the termination hearing.

> [P]arents have a responsibility to object when they claim the nature or extent of services is inadequate. A parent's objection to the sufficiency of services should be made early in the process so

appropriate changes can be made. In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding.

*In re L.M.*, 904 N.W.2d 835, 839-40 (Iowa 2017) (internal citations and quotations omitted). Thus, we could consider the claim waived.

But taking the mother's claim at face value, the mother did not object to the "nature or extent" of services—her only complaint at the January 2022 hearing was that she preferred to use a different doctor. "We are mindful that 'the reasonable-efforts mandate does not create a menu from which discerning parents may order specific services." *In re A.C.*, No. 20-0964, 2020 WL 7021569, at *2 (Iowa Ct. App. Nov. 30, 2020) (citation omitted). That the mother preferred one provider over another does not mean DHHS failed to provide reasonable efforts.

Moreover, the mother's claim that the lack of a written psychological evaluation prevented her from accessing services is belied by the record. No one contests that the mother suffers from prior trauma, depression, and anxiety. She had access to three therapists, but ceased attending each one on her own accord. She expressed that she would not participate in therapy so long as DHHS was requiring her to do so despite acknowledging that therapy would benefit her. "The issue in this case was not the failure to provide appropriately tailored . . . services, it was [the mother's] failure to avail herself of the services provided. [The mother's] failure to use the services provided defeats her reasonable-efforts claim." *In re C.P.*, No. 18-1536, 2018 WL 6131242, at *3 (Iowa Ct. App. Nov. 21, 2018).

**C.    Guardianship**

The mother contends the juvenile court should have placed the children in a guardianship with A.K.'s mother-in-law. A juvenile court may decline to terminate

parental rights and instead impose a guardianship. *See* Iowa Code § 232.104(2)(d)(2). That said, "a guardianship is not a legally preferable alternative to termination." *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018) (citation omitted).

We determine the juvenile court properly decided to not grant a guardianship in this case. The individual the mother identifies as a potential guardian, A.K.'s mother-in-law, asked DHHS to place the children out of her custody in June, mere months before the termination hearing. Nothing in our record suggests this previous placement is willing to care for the children. It is illogical to place the children in a guardianship with someone who so recently ceased her role as a caretaker for them. And even if she had a change of heart, the children need permanency, which a guardianship would not support. Such an arrangement would expose the children to the continuing instability caused, in part, by A.K.'s persistent moves between that residence and living with B.C. And the children are very young. We decline to establish a guardianship in lieu of termination.[5]

---

[5] The mother makes a passing reference to the best interest of the children in her briefing concerning her request for a guardianship. To the extent the mother is making a best interest argument separate from her guardianship request, we determine that termination is in the best interest of the children. By the time of the termination hearing, the boys had been out of the mother's custody for two years. The mother asserts that because other options, such as a guardianship or placement with fictive kin may be available, termination is not in the best interest of the children. But what the mother's argument does not address is that placement with fictive kin did not succeed in the underlying CINA proceeding. And these boys are long overdue for permanency. *See P.L.*, 778 N.W.2d at 41 (considering a child's best interest involves assessing "the best placement for furthering the long-term nurturing and growth of the child"). Termination of the mother's parental rights is in the children's best interests.

**IV.    Father—Six Month Extension**

A.K. asks for a six-month extension.[6]  A juvenile court may grant a six-month extension if, pursuant to "specific factors, conditions, or expected behavioral changes," the court makes a "determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period."  Iowa Code § 232.102(2)(b).

We find the father would not be in a position to resume custody of R.C.K. in six-months.  The father has not meaningfully participated in substance-abuse or mental-health treatment.  He tested positive for methamphetamine a little over a month prior to the termination hearing.  He is unemployed and lacks stable housing, instead relying on B.C. and his wife for a place to stay.  He has not meaningfully participated in visits since the children moved to the foster placement.  The father's past performance in failing to meet case plan expectations leaves us with little assurance he will meaningfully engage and show progress on the matters preventing reunification.  *See In re B.H.A.*, 938 N.W.2d 227, 233 (Iowa 2020) (explaining we look to a parent's past performance to predict future care).  We are unable to determine that the need for removal of R.C.K. from his home will no longer exist at the end of the additional six-month period.  We decline to grant a six-month extension.

**AFFIRMED ON BOTH APPEALS.**

---

[6] The father had been granted a six-month extension at the permanency hearing held in January 2022.